# Exhibit A

Memorandum Opinion Granting in Part and Denying in Part Joint Motion of Post-Effective Date Debtors, the Ad Hoc Committee of Corporate Creditors, and Coinbase Inc. and (I) Authorizing Supplemental Distribution to Eligible Corporate Creditors, (ii) Approving Procedures for Supplemental Corporate Creditor Distributions, (iii) Denying Request for $1.5 Million Payment to Ad Hoc Committee of Corporate Creditors, and (iv) Approving Related Relief

[ECF 7726]

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------x

In re:                                                    NOT FOR PUBLICATION

      CELSIUS NETWORK LLC, *et al.*,                    Chapter 11

                                                          Case No. 22-10964 (MG)

               Post-Effective Date Debtors.

-------------------------------------------------------------------------x

## MEMORANDUM OPINION GRANTING IN PART AND DENYING IN PART JOINT MOTION OF POST-EFFECTIVE DATE DEBTORS, THE AD HOC COMMITTEE OF CORPORATE CREDITORS, AND COINBASE INC. AND (I) AUTHORIZING SUPPLEMENTAL DISTRIBUTION TO ELIGIBLE CORPORATE CREDITORS, (II) APPROVING PROCEDURES FOR SUPPLEMENTAL CORPORATE CREDITOR DISTRIBUTIONS, (III) DENYING REQUEST FOR $1.5 MILLION PAYMENT TO AD HOC COMMITTEE OF CORPORATE CREDITORS, AND (IV) APPROVING RELATED RELIEF

*A P P E A R A N C E S :*

KIRKLAND & ELLIS LLP
*Attorneys for Post-Effective Date Debtors*
601 Lexington Avenue
New York, New York 10022
By:    Joshua A. Sussberg, Esq.

333 West Wolf Point Plaza
Chicago, Illinois 60654
By:    Patrick J. Nash, Esq.
         Ross M. Kwasteniet, Esq.
         Christopher S. Koenig, Esq.
         Dan Latona, Esq.

WHITE & CASE LLP
*Attorneys for the Litigation Administrator*
1221 Avenue of the Americas
New York, New York 10020
By:    David M. Turetsky, Esq.
         Samuel P. Hershey, Esq.
         Joshua D. Weedman, Esq.

111 South Wacker Drive
Suite 5100
Chicago, Illinois 60606
By:    Gregory F. Pesce, Esq.

Southeast Financial Center
200 South Biscayne Blvd.
Suite 4900
Miami, Florida 33131
By:     Keith H. Wofford, Esq.

555 South Flower Street
Suite 2700
Los Angeles, California 90071
By:     Aaron Colodny, Esq.

SARACHECK LAW FIRM
*Attorney for Ad Hoc Committee of Corporate Creditors*
670 White Plains Road
Penthouse Suite
Scarsdale, New York 10583
By:     Joseph E. Saracheck, Esq.

CLEARY GOTTLIEB STEEN & HAMILTON LLP
*Attorney for Coinbase*
One Liberty Plaza
New York, New York 10006
By:     Thomas S. Kessler

UNITED STATES TRUSTEE
*Attorney for the United States Trustee*
One Bowling Green
Suite 534
New York, New York 10004
By:     Shara Cornell, Esq.

SEAN XUE
*Pro se Creditor*

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

One of the central aims of bankruptcy, a system designed to address competing interests, is to provide a debtor with a "fresh start" while maximizing value available to creditors.  *See In re Miszko*, 627 B.R. 809, 821 (Bankr. S.D.N.Y. 2021) ("[T]he principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor." (quoting *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007)); *Truck Ins. Exch. v. Kaiser*

*Gypsum Co., Inc.*, 602 U.S. 268, 272 (2024) ("Chapter 11 strikes 'a balance between a debtor's interest in reorganizing and restructuring its debts and the creditors' interest in maximizing the value of the bankruptcy estate.'") (quoting *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 51 (2008)).  In furtherance of this aim, courts have favored "[s]ettlements and compromises . . . in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate."  *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640 (Bankr. S.D.N.Y. 2012) (alterations in original) (citations omitted); *see also In re Iridium Operating LLC*, 478 F.3d 452, 455 (2d Cir. 2007) (recognizing that settlements "facilitate the efficient functioning of the judicial system" and, in chapter 11, "clear a path for the efficient administration of the bankrupt estate").  It is these principles that guide the Court's evaluation of settlements and compromises, including the one before it today.

Pending before the Court is the joint motion (the "Motion," ECF Doc. # 7661) of the post-effective date debtors (the "Post-Effective Date Debtors" and, prior to the Effective Date, the "Debtors"), the ad hoc committee of corporate creditors (the "Ad Hoc Committee of Corporate Creditors"), and Coinbase Inc. ("Coinbase" and, together with the Post-Effective Date Debtors the Ad Hoc Committee of Corporate Creditors, the "Parties").[1]  Annexed to the Motion is a proposed order as Exhibit A (the "Proposed Order"), which includes as exhibits, (i) a term sheet of the agreement between the Parties as Exhibit 1 (the "Settlement Term Sheet" and the agreement it reflects, the "Settlement"); (ii) the Supplemental Coinbase Agreement as Exhibit 2; and (iii) a proposed election form to be provided to all Eligible Corporate Creditors as Exhibit 3 (the "Election Form").  Under the Settlement, Eligible Corporate Creditors will be

---

[1]      Defined terms used but not defined herein shall have the meanings ascribed to them in the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates (Conformed for MiningCo Transaction)* (the "Plan," ECF Doc. # 4289).

3

given the Liquid Cryptocurrency (or its equivalent current value) that they would have received

if they were initially scheduled for a Liquid Cryptocurrency distribution.

The Motion seeks entry of an order (i) authorizing the Post-Effective Date Debtors to

make this additional distribution to certain "Eligible Corporate Creditors"[2] (the "Supplemental

Corporate Creditor Distribution"); (ii) approving the related proposed procedures (the

"Supplemental Distribution Election Procedures") for Eligible Corporate Creditors; (iii)

approving the settlement of the *Motion Seeking Entry of an Order (I) Approving Further*

*Distribution Under Plan of Reorganization for the Faller Creditors and (II) Granting Related*

*Relief* (together with all joinders thereto, the "Corporate Creditor Motion," ECF Doc. # 4911) as

between the Parties that, in turn, also resolves the *Motion to Direct Celsius to Issue Australian*

*Corporate Creditors with Bitcoin (BTC) and Ether (ETH), not USD Cash, for those who Remain*

*Unpaid their Distributions in the Amounts of Cryptocurrency that they would have Received for*

*their Claims as at the 15 January 2024 prices fixed by Celsius, or in the Alternative, Motion to*

*Compel that Celsius be Directed to Issue Bankruptcy Proceeds to Australian Corporate*

*Creditors Only in USD Wire Transfers Rather than Checks* (the "Australian Corporate Creditor

Distribution Motion," ECF Doc. # 6892); and (iv) granting related relief.  (Motion ¶¶ 6–7.)

On September 5, 2024, the U.S. Trustee ("UST") filed an objection to the Motion (the

"UST Objection," ECF Doc. # 7667).  That same day, the objection of *pro se* creditor Sean Xue

("Xue" and his objection, the "Xue Objection," ECF Doc. # 7666) was also docketed, objecting

---

[2]    "Eligible Corporate Creditor" is defined to be (i) a nonindividual (*i.e.*, anyone who is not a natural person,
such as a trust, LLC, partnership, corporation, or other non-individual entity) (each a "Corporate Creditor"), (ii) that
is organized in a Supported Jurisdiction (as defined in the Supplemental Coinbase Agreement) to which Coinbase
makes distributions (an "Eligible Country"), and (iii) was not one of the 100 Corporate Creditors already selected
for a distribution from Coinbase.  (Motion at 9 n.7.)  Corporate Creditors not in a Supported Jurisdiction are
ineligible to participate in the Settlement and are "outside the scope of th[e] Motion" because Coinbase cannot make
distributions to such Corporate Creditors.  (*Id.*)

to the relief sought.  On September 11, 2024, the Post-Effective Date Debtors filed a reply (the "Reply," ECF Doc. # 7677) in response to the objections received, and a hearing on the Motion was held the following day.

The Motion and the Settlement it seeks approval of represent the culmination of the Parties' extensive efforts towards a consensual resolution following a two-day mediation (the "Mediation") that successfully resolved what has come to be known as one of the most "complex disputed post-emergence issues" in these chapter 11 cases.  (Reply ¶ 1.)

For the reasons discussed below, the Court **GRANTS** the Motion in part and denies the Motion in part.

## I.  BACKGROUND

### A.  Relevant Case History

On July 13, 2022 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the U.S. Bankruptcy Code before this Court.  (*See* ECF Doc. # 1.)  On November 9, 2023, the Court entered an order (the "Confirmation Order," ECF Doc. # 3972) confirming the *Modified Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtors Affiliates* (ECF Doc. # 3577).  Following entry of the Confirmation Order, the Debtors sought to pivot to the Orderly Wind Down and toggle to an alternative transaction that would create a standalone bitcoin mining company (the "MiningCo Transaction").  (*See Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief* (ECF Doc. # 4050).)  The Court ultimately approved the Debtors' implementation of the MiningCo Transaction on December 27, 2023, which the Debtors incorporated in the Plan.

On January 31, 2024 (the "Effective Date"), the Plan went effective.  (*See Notice of Occurrence of Effective Date of Debtors' Modified Chapter 11 Plan of Reorganization and*

*Commencement of Distributions* (the "Effective Date Notice"), ECF Doc. # 4298.)  Each of the Disclosure Statement (ECF Doc. # 3332); the Plan; the *Seventh Notice of Filing of Plan Supplement* (ECF Doc. # 3869), which includes the relevant agreement with Coinbase (the "Coinbase Agreement"); the Effective Date Notice; and subsequent updates on distributions (collectively, the "Distribution Updates") all provide for, or indirectly reference, distributions to Corporate Creditors.  Corporate Creditors account for approximately 1,900 (or 0.5% by number) of all of the Debtors' approximately 375,000 creditors expected to receive a distribution under the Plan.  (Motion ¶ 11.)  Based on negotiations with Coinbase to provide distributions to Corporate Creditors, the Debtors designed their initial distribution process to provide Liquid Cryptocurrency distributions to the 100 largest Corporate Creditors who affirmatively notified the Debtors they would prefer a Liquid Cryptocurrency distribution.[3]  (*Id.*)

The Debtors indicate that, ultimately, of the 100 Corporate Creditors who elected to receive a Liquid Cryptocurrency distribution through Coinbase, 87 have received their distribution through Coinbase, 2 have completed all necessary onboarding steps and are pending distribution, 3 have initiated but not yet completed Coinbase's onboarding process, 5 have been rejected by Coinbase, and 3 have not initiated or completed Coinbase's onboarding process. (*Id.*)  All remaining Corporate Creditors who were not among the 100 selected to receive a distribution through Coinbase were scheduled to receive a Cash distribution.  (*Id.* ¶ 12.)  As of the date of the Motion, the Post-Effective Date Debtors have made Cash distributions to

---

[3]     On January 19, 2024, the Debtors' notified 250 Corporate Creditors holding the largest claims against the Debtors that, pursuant to the Debtors' agreement with Coinbase, the Debtors could only make distributions in Liquid Cryptocurrency to 100 Corporate Creditors.  (Effective Date Notice at 4; *Post-Effective Date Debtors' Statement Relating to Selection of Coinbase and Determination of the 100 Corporate Creditor Limit for Liquid Cryptocurrency Distributions* (the "Debtors' Coinbase Creditors Statement"), ECF Doc. # 7660 ¶ 24.)  An election form was sent to these creditors pursuant to which they could elect to receive Liquid Cryptocurrency or cash that established a January 23, 2024 deadline to respond.  (*Id.*)  Approximately 150 Corporate Creditors timely responded, 27 of which elected to receive a Cash distribution and 118 of which elected a Liquid Cryptocurrency distribution through Coinbase.  (*Id.*)

approximately 990 Corporate Creditors in an amount totaling approximately $96 million, which represents 85% of the total value currently eligible for distributions to Corporate Creditors originally scheduled to receive a Cash distribution.  (*Id.*)  The Post-Effective Date Debtors have also expanded their distribution agreement with PayPal to allow the use of Hyperwallet Services ("Hyperwallet") to facilitate Cash distributions.  (*Id.*)

### B.  The Corporate Creditors Dispute and Mediation Efforts

At issue between the parties is the 100 Corporate Creditor limit described above.  On June 3, 2024, BFaller RD LLC, BFaller ROTH RD LLC, SFaller TRD RD LLC, and SFaller RD LLC (collectively, the "Faller Creditors") filed the Corporate Creditor Motion, asserting that the Plan required a Liquid Cryptocurrency distribution for every Corporate Creditor who desired one, and sought damages.  (*See generally* Corporate Creditor Motion.)  Numerous other Corporate Creditors joined in the relief requested, resulting in the formation of the Ad Hoc Committee of Corporate Creditors.[4]  (*See* Motion ¶ 2.)

On July 7, 2024, an ad hoc group of Australian Corporate Creditors filed the Australian Corporate Creditor Distribution Motion, seeking distributions in cryptocurrency to Australian Corporate Creditors, or in the alternative, various forms of relief to facilitate cash distributions.  (*See generally* Australian Corporate Creditor Distribution Motion.)  The Post-Effective Date Debtors have opposed both motions.  (*See* ECF Doc. ## 4974, 7535 (objection and supplemental objection of the Post-Effective Date Debtors).)

On July 29, 2024, the Court held an initial hearing on the motions.  At the hearing, the Court noted that the Coinbase Agreement and related agreements did not explicitly provide for a

---

[4]      Joinders were filed at ECF Doc. ## 4916, 4917, 4918, 4919, 4920, 4921, 4922, 4923, 4928, 4929, 4934, 4935, 4938, 4939, 4940, 4944, 4945, 4946, 4947, 4950, 4952, 4953, 4954, 4956, 4958, 4959, 4961, 4963, 4964, 4966, 4967, 4968, 4971, 4972, 4985, 4986, 5194, 5195, 5196, 5197, 5594, 6569, 7575.

100 Corporate Creditor limit.  Following the July hearing, the Post-Effective Date Debtors, the

Litigation Administrator, and the Ad Hoc Committee of Corporate Creditors filed a joint status

report on August 7, 2024 (the "Joint Status Report," ECF Doc. # 7585), notifying the Court that

the parties, along with Coinbase, agreed to enter into mediation to resolve the matter.  (Joint

Status Report at 2.)  In accordance with this, the parties entered into the *Joint Stipulation and*

*Agreed Order Between the Post-Effective Date Debtors, Coinbase, the Litigation Administrator,*

*and the Ad Hoc Committee of Corporate Creditors for Appointment of a Mediator* (the

"Mediation Stipulation," ECF Doc. # 7588).

Beginning August 14, 2024, the Mediation was held among the initial parties to the

Mediation Stipulation as well as certain other creditors who later joined the Mediation

Stipulation.  (Motion ¶ 15.)  The Honorable Philip Bentley, Bankruptcy Judge for the Southern

District of New York, served as mediator.  (*Id.*)  Ultimately, the Mediation proved successful and

resulted in the Settlement that is now before the Court.

### C.  The Settlement

The Settlement contemplates providing each Eligible Corporate Creditor a Supplemental

Corporate Creditor Distribution calculated to provide such creditor with the amount of BTC and

ETH that they would have received under the Plan had they been slated for a distribution in

Liquid Cryptocurrency on the Effective Date, or the Cash equivalent thereof using then-

prevailing market prices.  (Motion ¶ 16.)  These distributions will be funded from the Disputed

and Contingent Claims Reserve established under the Plan.[5]  (*Id.* ¶ 4.)

---

[5]      The Post-Effective Date Debtors indicate that they have already earmarked an amount of Liquid
Cryptocurrency equal to the amount needed if every eligible creditor elected for a Supplemental Cryptocurrency
Distribution.  (Motion ¶ 19.)

All Eligible Corporate Creditors other than members of the Convenience Class will have the option to elect to receive this supplemental distribution in either Liquid Cryptocurrency or Cash, the former subject to successfully completing the onboarding process with Coinbase. (*Id.* ¶¶ 3, 16.) Meanwhile, Eligible Corporate Creditors in the Convenience Class will receive Cash in the amount equivalent to what their supplemental distribution would have been in Liquid Cryptocurrency using market prices that are close in time to the Cash distribution (the "Supplemental Cash Distribution"). (*Id.* ¶¶ 3, 16) Supplemental Cash Distributions will be valued in such a manner so as to avoid a recurrence of the issues that gave rise to the Corporate Creditor Motion in the first place. (*Id.* ¶ 16.)

For creditors who have already received a Cash distribution using January 16, 2024 prices for BTC and ETH, the Cash received will be set off against the Liquid Cryptocurrency earmarked for their Supplemental Corporate Creditor Distribution (or the Cash equivalent) utilizing the average prices for BTC and ETH for the Cash distribution period of February 22, 2024 to August 12, 2024, and they will receive their Supplemental Corporate Creditor Distribution net of that set off (collectively, the "BTC & ETH Average Values" and individually, the "BTC Average Value" and "ETH Average Value"). (*Id.* ¶ 17.)

Each Eligible Corporate Creditor that elects to receive Cash can elect whether to receive their Supplemental Cash Distribution through check, wire transfer, or Hyperwallet. (*Id.* ¶ 26.) In each case, the Plan Administrator will use commercially reasonable efforts to honor such election. (*Id.*) In addition, the Liquid Cryptocurrency allocated to Eligible Corporate Creditors that do not affirmatively elect to receive the Supplemental Cryptocurrency Distribution or are unable to receive the Supplemental Cryptocurrency Distribution will be sold at market prices and

sale proceeds will be sent to those creditors in accordance with the Supplemental Cash

Distribution Procedures.  (*Id.* ¶ 28.)

The Post-Effective Date Debtors have agreed to use best efforts to comply with fixed

timetables for Cash distributions for the Supplemental Cash Distribution, including (i) making an

initial attempt to distribute within 14 days of the receipt of the information necessary to complete

the distribution following the election deadline and (ii) selling the Liquid Cryptocurrency within

7–14 days of the relevant distribution.  (*Id.* ¶¶ 3, 27, 29.)  Meanwhile, Coinbase has agreed to (i)

use commercially reasonable efforts to begin the onboarding process within 14 days after the

election period, and (ii) continue facilitating the onboarding process and making distributions for

as long as it takes to ensure that all electing Eligible Corporate Creditors who are able to

complete the onboarding process receive a Liquid Cryptocurrency distribution.  (*Id.* ¶ 3.)  To

assist in implementing the Settlement, Coinbase has agreed to enter into the Supplemental

Coinbase Agreement, which sets forth, among other things, the terms governing the onboarding

process.  (*See* Settlement Term Sheet § 4.)

The Settlement also imposes certain additional reporting and communication

requirements to address creditors' transparency concerns regarding implementation of the

Settlement.  (*See* Motion ¶ 34.)  First, the Plan Administrator must use best efforts to provide an

Eligible Corporate Creditor with an update on its distribution and any available details regarding

a failed distribution attempt within seven days of the Plan Administrator receiving notice that a

distribution to such creditor was unsuccessful.  (*Id.* ¶ 32.)  The Plan Administrator will also

submit monthly reports (each, a "Monthly Report") to the Bankruptcy Court regarding

distributions under the Settlement.  (*Id.*)  Additionally, Jarred Herzberg will be appointed

"Corporate Creditor Representative" to assist in facilitating communications between the

Eligible Corporate Creditors and the Post-Effective Date Debtors regarding the Supplemental

Corporate Creditor Distribution process.  (*Id.* ¶¶ 3, 33.)  Mr. Herzberg's reasonable fees and

expenses, including counsel fees, will be paid from the Disputed and Contingent Claims Reserve.

(Settlement Term Sheet § 6.)

Lastly, the Settlement also provides for a $1.5 million payment to the Ad Hoc Committee

of Corporate Creditors and its counsel.  (*Id.* § 7.)  The payment serves as a "material part" of the

Settlement and partial consideration for the contemplated mutual releases among the Parties.  (*Id.*

§§ 7–8.)

### D.  The Motion

#### 1.  <u>The Settlement</u>

As set forth in the Motion, the Parties agree that the Plan authorizes the distribution of

Liquid Cryptocurrency (or its equivalent amount in Cash) to Eligible Corporate Creditors.

(Motion ¶ 35.)  They submit that the Settlement represents a fair and equitable compromise that

is in the best interests of the Post-Effective Date Debtors' estates, falls "well within" the range of

reasonableness, and satisfies each of the *Iridium* Factors (defined below).  (*Id.* ¶ 42; *see also id.* ¶

50 (stating that the Post-Effective Date Debtors have determined, in an exercise of their business

judgment, that the Settlement is "fair, equitable, and eminently reasonable").)  Specifically, the

Parties argue that the Settlement will resolve the Corporate Creditor Motion without the need for

costly and protracted litigation, conserving significant estate resources, in satisfaction of the first

and second *Iridium* Factors.  (*Id.* ¶ 43.)  The resolution of this critical issue in these chapter 11

cases, the Parties contend, will also provide for an equitable distribution of estate assets.  (*Id.* ¶

45.)  Accordingly, the Settlement, the Parties submit, is in the best interests of the Post-Effective

Date Debtors' estates and satisfies the third and fourth *Iridium* Factors.  (*Id.* ¶¶ 45–46.)

In addition, the Settlement's releases, the Parties believe, are mutual, narrow in scope, essential to the Settlement, and are similar in nature to other settlements of the same nature in other chapter 11 cases. (*Id.* ¶ 47.) Indeed, they are only granted by those who participated in the Mediation or affirmatively accept a Supplemental Cryptocurrency Distribution. (*Id.*) Accordingly, the Parties believe that the sixth *Iridium* Factor is also met.

Finally, the Parties also believe that the remaining two *Iridium* Factors are satisfied. They submit that all Parties to the Settlement are represented by competent and experienced counsel and various financial advisors, and the Settlement is the result of good faith, arm's-length negotiations between the Parties. (*Id.* ¶ 48.) Additionally, throughout settlement discussions and the Mediation, the Parties represent that they worked in good faith and without collusion towards a consensual resolution of all disputed issues. (*Id.*) In light of the foregoing, the Motion argues that the Settlement reflects the best possible consensual resolution of the issues raised and should be approved. (*Id.* ¶¶ 49–50.)

### 2.  The Supplemental Coinbase Agreement

The Motion further seeks approval of the Supplemental Coinbase Agreement, which sets forth the terms and conditions upon which Coinbase is willing to facilitate the Supplemental Cryptocurrency Distributions contemplated by the Settlement. (*Id.* ¶ 51.) Specifically, it provides for, among other things, the agreement by Coinbase to work to onboard and make distributions to Eligible Corporate Creditors who elect the Supplemental Cryptocurrency Distribution (and who comply with and pass the onboarding process) ***regardless*** of whether the onboarding process is completed prior to or after the expiration of the existing Coinbase agreement. (*Id.* ¶ 52 (emphasis added).) The agreement also provides for a specific schedule and milestones for the onboarding process. (*Id.* ¶ 54.)

The Parties submit that the Supplemental Coinbase Agreement is a product of extensive arm's-length and good faith negotiations between the Post-Effective Date Debtors and Coinbase. (*Id.* ¶ 52.)  As the existing agreement expires in November 2024, the Parties indicate that the Supplemental Coinbase Agreement also reflects a "significant concession" on the part of Coinbase and would ensure that Coinbase will work to onboard all electing creditors.[6] (*Id.*)

The Post-Effective Date Debtors believe that the terms of the Supplemental Coinbase Agreement are reasonable, and request approval of the Supplemental Coinbase Agreement to facilitate implementation of the Settlement.  (*Id.* ¶ 57.)

3.  <u>Compensation for the Ad Hoc Committee of Corporate Creditors</u>

With respect to the $1.5 million compensation for the Ad Hoc Committee of Corporate Creditors, the Parties do not believe that Court approval is necessary but are nonetheless seeking authority from the Court "out of an abundance of caution."  (*Id.* ¶ 63.)  The payment, the Parties indicate, serves as recognition of the contribution of the Ad Hoc Committee of Corporate Creditors and its counsel to the Debtors' post-confirmation estate in bringing about a resolution. (*Id.* ¶ 58.)

**E.  UST Objection**

The UST opposes the Motion on two primary grounds: (i) the Settlement impermissibly modifies the substantially consummated Plan and (ii) the $1.5 million payment to the Ad Hoc Committee of Corporate Creditors and its counsel should be paid by "responsible parties" as opposed to the Debtors' estates.  (*See generally* UST Objection.)

As to the first, the UST argues that the Settlement, in violation of section 1127 of the Bankruptcy Code, impermissibly modifies the Plan, which was substantially consummated on

---

[6]    Coinbase has also agreed to work on onboarding 15 creditors simultaneously.  (Motion ¶ 53.)

January 31, 2024. (*Id.* at 16, 18.) These modifications include, among other things, the payment of the Supplemental Corporate Creditor Distribution, the costs and fees of Mr. Herzberg, and the $1.5 million payment to the Ad Hoc Committee of Corporate Creditors. (*Id.* at 18–19.) These amounts will be funded from Plan reserves that are finite and earmarked for distribution to other creditors. (*Id.*) The UST argues that the Bankruptcy Code only permits modification of a Plan prior to its substantial consummation. (*Id.* at 18.) Accordingly, the UST believes that the relief cannot be approved.

As to the second, the UST argues that the only legal basis for the payment of such fees are sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code, neither of which are applicable here. (*Id.* at 20.) Accordingly, the UST submits that the Post-Effective Date Debtors should be required to (i) submit under which statutory basis they are moving to pay such fees from Plan funds and (ii) provide further clarity regarding what fees are being requested and how the amount was calculated. (*Id.*)

### F. Xue Objection

At the outset, Xue argues that the "corporate creditor mediation is inequitable to creditors not covered by the Corporate Creditor Ad Hoc," because the Debtors "led the mediation with an express interest to arrive at a solution that elides their own culpability for an error they and their client are responsible for." (Xue Objection at 1.) He questions why Coinbase is "not being pursued" if there is a liability, and if there is no liability, why the Settlement was agreed to. (*Id.*)

The Xue Objection, like the UST's, appears to argue that the Settlement will adversely impact other creditors by requiring non-Corporate Creditors to bear the cost of Settlement. (*Id.* at 2–3.) He states that the calculation for the Supplemental Distributions—which uses average prices—will "allow many creditors to receive more than the number of BTC/ETH that they would have been distributed as of the effective date." (*Id.* at 1–2.) Further, he argues that it is

inequitable to not distinguish between Corporate Creditors who elected to receive fiat and those who elected cryptocurrency but were refused. (*Id.*)

Moreover, Xue also takes issue with the Post-Effective Date Debtors' agreement to pay the fees of the Ad Hoc Committee of Corporate Creditors, which he deems "excessive." (*Id.* at 2.)

### G. Post-Effective Date Debtors' Reply

In response to the UST and Xue Objections to the Settlement and its approval, the Post-Effective Date Debtors state that Xue's and the UST's arguments are unavailing and the Settlement should be approved. (Reply ¶ 5.) In support of this, the Post-Effective Date Debtors assert that the Settlement, as opposed to a modification, is merely an implementation of the Plan as Eligible Corporate Creditors will simply be receiving what they were originally entitled to under its terms with an option to convert the value into Cash. (*Id.* ¶¶ 5–6.)

Moreover, because the Settlement is implementing the Plan by ensuring Eligible Corporate Creditors receive the treatment under the Plan as if they had initially been scheduled for a Liquid Cryptocurrency distribution, the Post-Effective Date Debtors believe that there is no unfairness to individual creditors. (*Id.* ¶ 5.) Rather, they argue, the Settlement simply seeks to put the Eligible Corporate Creditors in the same position as individual creditors by using the Post-Effective Date Debtors' assets that are earmarked for resolving disputes regarding Claims. (*Id.*) The Post-Effective Date Debtors make clear that all eligible individual creditors will continue to receive *pro rata* shares in the Unsecured Claim Distribution Consideration, including any assets left in the Post-Effective Date Debtors' reserves once these chapter 11 cases have been fully administered. (*Id.*)

Finally, the Post-Effective Date Debtors maintain that they have authority under the Plan to pay the costs of professionals without further order from the Bankruptcy Court. (*Id.*)

## II.    LEGAL STANDARD

Rule 9019(a) of the Bankruptcy Rules governs the approval of compromises and

settlements, and provides as follows:

> On motion by the trustee and after notice and a hearing, the court may
> approve a compromise or settlement.  Notice shall be given to creditors, the
> United States Trustee, the debtor, and indenture trustees as provided in Rule
> 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

While "settlements or compromises are favored in bankruptcy and, in fact, encouraged,"

a court must first determine that the proposed settlement "is fair and equitable and in the best

interests of the estate."  *In re Chemtura Corp.*, 439 B.R. 561, 595 (Bankr. S.D.N.Y. 2010); *In re*

*Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991) (internal

quotation marks omitted) (citing *Protective Committee for Independent Stockholders of TMT*

*Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); *see also In re Lehman Bros.*

*Holdings*, 435 B.R. 122, 134 (S.D.N.Y. 2010).

The Second Circuit has set forth seven interrelated factors (the "*Iridium* Factors") to be

considered by a court in deciding whether to approve a compromise or settlement:

> (1) [T]he balance between the litigation's possibility of success and the
> settlement's future benefits;
>
> (2) the likelihood of complex and protracted litigation, "with its attendant
> expense, inconvenience, and delay," including the difficulty in collecting
> on the judgment;
>
> (3) "the paramount interests of the creditors," including each affected
> class's relative benefits "and the degree to which creditors either do not
> object to or affirmatively support the proposed settlement;"
>
> (4) whether other parties in interest support the settlement;
>
> (5) the "competency and experience of counsel" supporting, and "[t]he
> experience and knowledge of the bankruptcy court judge" reviewing, the
> settlement;

16

> (6) "the nature and breadth of releases to be obtained by officers and directors;" and
>
> (7) "the extent to which the settlement is the product of arm's length bargaining."

*Iridium*, 478 F.3d at 462 (citations omitted). A court "need not conduct an independent investigation into the reasonableness of the settlement but must only canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *Chemtura*, 439 B.R. at 594 (internal quotation marks omitted) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)).

In passing upon a proposed settlement, "the bankruptcy court does not substitute its judgment for that of the trustee." *Depo v. Chase Lincoln First Bank, N.A.*, 77 B.R. 381, 384 (N.D.N.Y. 1987), *aff'd sub nom. Depo v. Lincoln Bank*, 863 F.2d 45 (2d Cir. 1988) (citations omitted). Nonetheless, "while the 'approval of a settlement rests in the Court's sound discretion, the debtor's business judgment should not be ignored.'" *JPMorgan Chase Bank, N.A. v. Charter Commc'ns. Operating, LLC (In re Charter Commc'ns.)*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009) (quoting *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 75 (Bankr. S.D.N.Y 2009)). In addition, the court may "give weight to the informed judgments of the trustee or debtor-in-possession and their counsel that a compromise is fair and equitable." *In re Kerner*, 599 B.R. 751, 756 (Bankr. S.D.N.Y. 2019) (quoting *Drexel Burnham*, 134 B.R. at 505).

## III.  **DISCUSSION**

### A.  **The Settlement is an Implementation, Not Modification, of the Plan**

As an initial matter, the UST has raised concerns that the Settlement constitutes a modification of the Plan such that its approval would violate section 1127(b) of the Bankruptcy Code. Section 1127(b) of the Bankruptcy Code provides, in relevant part:

> The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan . . . . Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

11 U.S.C. § 1127(b). However, for the reasons discussed below, the Court finds that the Settlement is an implementation, rather than a modification of, the Plan.

*First,* the Corporate Creditors, other than the 100 largest Corporate Creditors who elected to receive Liquid Cryptocurrency, were originally scheduled to receive a Cash distribution in accordance with and pursuant to the Debtors' interpretation of the Plan and its terms. Relevant here are the following two provisions of the Plan:

- "For the avoidance of any doubt, the Debtors or Post-Effective Date Debtors, as applicable, may elect in their reasonable discretion to make any distribution in fiat if no Distribution Agent is reasonably available to make a Liquid Cryptocurrency distribution to any particular creditor." (Plan, Art. IV.G.)

- "For the avoidance of doubt, if the Debtors or the Plan Administrator cannot make a distribution of Liquid Cryptocurrency to a particular creditor (including because no Distribution Agent is available to make such distribution), such creditor will receive a distribution of fiat." (Plan, Art. IV.K.1.)

The Debtors engaged in an extensive process to determine how to distribute cryptocurrency to as many creditors as possible in a regulatorily compliant manner and to select an appropriate distribution agent to do so. (*See* Debtors' Corporate Creditors Statement ¶¶ 1–3.) In selecting a third-party distribution agent, the Debtors considered several factors, including the potential agent's (i) ability to make distributions to Celsius creditors in 165 countries both safely and reliably, (ii) regulatory compliance, (iii) security and risk controls, and (iv) financial resources. (*Id.* ¶ 3.) Ultimately, Coinbase was the only suitable distribution agent who agreed to facilitate distributions to any Corporate Creditors. (Reply ¶ 8.)

From August 2023 through January 16, 2024, the Debtors engaged in extensive, arm's-length negotiations with Coinbase regarding Coinbase facilitating Liquid Cryptocurrency distributions to more than 100 Corporate Creditors. (*Id.*) As it became evident to the Debtors that Coinbase could not agree to facilitate Liquid Cryptocurrency distributions to more than 100 Corporate Creditors within the one-year term of the parties' agreement, the Debtors reasonably determined that there was no distribution agent available to make Liquid Cryptocurrency distributions to most Corporate Creditors. As such, the Debtors indicate that they scheduled the majority of Corporate Creditors to receive a Cash distribution in accordance with the foregoing Plan provisions. (*See id.*)

*Second*, rather than modifying the Plan, the Court finds that the Settlement is merely providing Corporate Creditors what they would have been entitled to under the Plan had they originally been scheduled for a Liquid Cryptocurrency distribution on the Effective Date. For Eligible Corporate Creditors who have not yet received a distribution, such creditors will receive Liquid Cryptocurrency, with the option to convert the Liquid Cryptocurrency into Cash at current market prices to expedite receipt of their distribution. (*See id.* ¶¶ 10–11.) For Eligible Corporate Creditors who have already received a Cash distribution, the Settlement establishes a framework for making such creditors whole as well, using the weighted average price that accounts for what a creditor has already received and what it would have originally been entitled to under the Plan had it been scheduled for a Liquid Cryptocurrency distribution. (*Id.* ¶ 14.) This approach, rather than providing creditors with different values based on when they received their Cash distribution, streamlines the process and avoids treating similarly situated creditors differently.

As the Settlement provides Eligible Corporate Creditors what they were entitled to under the Plan (*i.e.*, the value they would have received had they originally been slated to receive a Liquid Cryptocurrency distribution) and distributions will be funded in accordance with the terms of the Plan, the Settlement cannot and does not negatively impact other creditors. Article IV.F of the Plan provides that:

> The Debtors and the Post-Effective Date Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand as of the Effective Date and net proceeds from the sale of GK8, (2) Liquid Cryptocurrency (in the Liquid Cryptocurrency Distribution Amount), (3) the MiningCo Common Stock, (4) Litigation Proceeds, and (5) the proceeds of the monetization of the Debtors' illiquid assets other than the Recovery Causes of Action.

(Plan, Art. IV.F.) In other words, the Post-Effective Debtors must use remaining assets to make required distributions under the Plan. At this time, the Post-Effective Date Debtors indicate that the only available liquid assets are those in their reserves and the amounts needed to wind down the estates and prosecute causes of action as contemplated by the Plan. (Reply ¶ 16.) Therefore, the Post-Effective Date Debtors must use the Liquid Cryptocurrency held in these reserves—the only available source for distributions—to fund the supplemental distribution payments to Eligible Corporate Creditors. Indeed, this is what the reserves were intended for. [7] (*See* Sept. 12, 2024 Hr'g Tr. at 18:18–20 ("We used that reserve for that issue as well, because that's what it's for. It's for disputes about claims and distributions under the [P]lan.").) The Settlement, therefore, complies with the terms of the Plan.

---

[7]     The Post-Effective Date Debtors previously dipped into these reserves to fund supplemental distributions in the amounts of $18.3 million worth of Liquid Cryptocurrency and $6.1 million in MiningCo Common Stock to creditors who mistakenly made the Convenience Claim Election. (*See Order (I) Approving Automatic Revocation of Presumed Mistaken Convenience Claim Elections, (II) Approving Optional Revocation Procedure for Eligible Convenience Claim Elections, and (III) Granting Related Relief*, ECF Doc. # 4741; *Post-Effective Date Debtors' Motion Seeking Entry of an Order (I) Approving Automatic Revocation of Presumed Mistaken Convenience Claim Elections, (II) Approving Optional Revocation Procedure for Eligible Convenience Claim Elections, and (III) Granting Related Relief* (ECF Doc. # 4372) ¶ 10.)

It must also be noted that the Settlement is simply giving Corporate Creditors the value that individual creditors received under the Plan, using the Post-Effective Date Debtors' assets to make the supplemental distribution.  By design, the Plan provides creditors entitled to Unsecured Claim Distribution Consideration (*i.e.*, Holders of Earn, Withhold, Post-Set Off, Unsecured Loan, and General Unsecured Claims) their Pro Rata share of the Debtors' assets, minus certain carve-outs, including the funding of the wind down and assets needed for distributions to creditors on account of Convenience or Custody Claims.  (*See* Plan, Art. I.A. 150; Plan, Art. III.B.2, 5, & 7–9.)  The Settlement merely provides Eligible Corporate Creditors the appreciation of their Liquidated Cryptocurrency in value since the Effective Date as opposed to an additional percentage of the Debtors' assets.  Thus, as the Post-Effective Date Debtors indicate, once all distributions are complete under the Plan, all creditors entitled to receive Unsecured Claim Distribution Consideration will have received, in the aggregate, their Pro Rata share of the Debtors' assets eligible for distribution.  (*See* Reply ¶ 19.)  No creditors will receive less, in total, than they would otherwise have been entitled to under the Plan; the Settlement merely seeks to make a supplemental distribution to Eligible Corporate Creditors to ensure they receive the value of what they were originally entitled to under the Plan.  Accordingly, non-Corporate Creditors will not be harmed, and Xue and the UST's arguments contending otherwise are unpersuasive.[8]

The Court, therefore, concludes that the Settlement is an implementation, not modification, of the Plan.

---

[8]    The Post-Effective Date Debtors clarify that their statements concerning the "fixed and finite" nature of resources for additional distributions under the Plan, which the UST focuses on, were referring to the "perils of requiring the Post-Effective Date Debtors to make 'true up' payments to *every* creditor based on shifts in cryptocurrency prices and the speculative actions such creditors could have taken." (Reply ¶ 20 (emphasis in original).)  The Settlement resolves the issue with respect to Eligible Corporate Creditors and forecloses the ability of Corporate Creditors to switch distribution methods to take advantage of shifts in cryptocurrency prices.  Given the Post-Effective Date Debtors' clarification, the UST's argument is also without merit.

### B. The Settlement Meets the *Iridium* Factors

Having found that the Settlement is not a modification of the Plan, the Court turns to whether the Settlement satisfies the Second Circuit's *Iridium* Factors. As discussed in greater detail below, each of the *Iridium* Factors weighs in favor of the Court approving the Settlement.

1. <u>Balance Between the Litigation's Possibility of Success and the Settlement's Future Benefits and the Likelihood of Complex and Protracted Litigation</u>

The Settlement's future benefits are clear and evident—it provides an immediate and certain resolution of the dispute with the Corporate Creditors, avoids further delayed distributions to Corporate Creditors, and facilitates implementation of the Plan. It is evident that what the Parties have achieved in the Settlement avoids inevitable protracted and uncertain litigation among the Parties, conserving both estate resources and assets. Indeed, it is these considerations that drove the parties to pursue the Mediation in the first place. (*See* Reply ¶ 24 (indicating that the Parties elected to enter into mediation rather than pursue "costly and time-consuming litigation").)

As reflected by the dozens of joinders filed to the Corporate Creditor Motion, the hotly contested nature of the dispute with the Corporate Creditors is undeniable. And the Post-Effective Date Debtors have made clear that this has been one of the "most challenging distribution issues" they have faced in these chapter 11 cases. (Motion ¶ 2.) While the Debtors expected, to some degree, logistical challenges relating to the KYC process for Corporate Creditors, these challenges were "compounded by unanticipated legal controversies that ***threatened to disrupt the Post-Effective Date Debtors' entire distribution process***." (*Id.* (emphasis added).) Notably, the Settlement also resulted in a concession from Coinbase to facilitate Liquid Cryptocurrency distributions under the Plan beyond the November 2024

expiration of the existing Coinbase agreement as reflected in the Supplemental Coinbase Agreement.  (*See id.* ¶ 52.)  Thus, the future benefits of the Settlement are unmistakable.

Accordingly, the first and second *Iridium* Factors weigh in favor of approving the Settlement.

### 2.   Paramount Interests of Creditors and the Support of Other Parties in Interest

For the reasons already discussed, the Settlement is in the best interests of the Debtors' creditors and has the support of the Parties.  The Settlement, as noted, resolves one of the most significant issues in the distribution process for these chapter 11 cases.  The negotiated resolution enables the Plan Administrator to distribute Liquid Cryptocurrency (or its cash equivalent) to more Corporate Creditors, all without the need for additional litigation, and achieves an equitable distribution of the Post-Effective Date Debtors' estates.  To date, only the UST and Xue have opposed the relief sought and, for the reasons discussed, the Court does not find their arguments to be persuasive.

Accordingly, the third and fourth *Iridium* Factors also weigh in favor of approval.

### 3.   Competency and Experience of Counsel and Product of Arm's-Length Bargaining

The Parties submit that each has been represented by competent and experienced counsel and various financial advisors, and the Settlement is the result of good faith, arm's length negotiations between the Parties.  (*Id.* ¶ 48.)  Additionally, they also represent that, throughout settlement discussions and Mediation, the Parties worked in good faith and without collusion towards reaching a consensual resolution of disputed issues.  (*Id.*)  The Court has no reason to think otherwise.  Moreover, Judge Bentley, who oversaw the Mediation, is experienced and well-qualified.

Accordingly, the fifth and seventh *Iridium* Factors weigh in favor of approving the Settlement.

    4.  <u>Scope of Releases</u>

Finally, the releases set forth in the Settlement Term Sheet are mutual, narrow in scope, essential to the Settlement, and are similar to other settlements of the same nature in other chapter 11 cases. Specifically, they are only granted by parties (i) who participated in the Mediation, or (ii) who affirmatively accept a Supplemental Cryptocurrency Distribution. (*See id.* ¶ 47.)

Accordingly, the sixth *Iridium* Factor supports approving the Settlement.

**C. The $1.5 Million Payment to the Ad Hoc Committee of Corporate Creditors and its Counsel is Not Approved**

Both the UST and Xue have raised the propriety of the $1.5 million payment to the Ad Hoc Committee of Corporate Creditors and its counsel. Section 7 of the Settlement Term Sheet provides:

> The Parties recognize the contribution of the Ad Hoc Committee of Corporate Creditors and its members to the Debtors' estate and to the bankruptcy process in bringing its motions and in participating in the Mediation. As a material part of this settlement and as partial consideration for the releases contemplated herein, the Parties agree that the Post-Effective Date Debtors will compensate the Ad Hoc Committee of Corporate Creditors and its counsel in the aggregate amount of $1.5 million.

(Settlement Term Sheet § 7.) The Court notes that, as a general principle, a settlement is not a *carte blanche* to hand out estate assets to anyone who asks. While the Court does not take issue with the reimbursement of actual professional fees the Ad Hoc Committee of Corporate Creditors incurred, the language of the Settlement Term Sheet appears to suggest that the $1.5 million payment also includes compensation to the Ad Hoc Committee of Corporate Creditors. This, the Court will not approve.

24

Much of the discussion about this provision, both in the pleadings and during the hearing, has cast this payment as "fees." However, it is not evident from the plain language of the Settlement Term Sheet whether this payment is, in fact, for fees alone. The Motion describes the payment as "*compensation* to the Ad Hoc Committee of Corporate Creditors and its counsel to recognize their contribution to the Debtors' post-confirmation estate in bringing its motions and collaboratively seeking a solution." (Motion ¶ 59 (emphasis added).) This is consistent with the Settlement Term Sheet, which states that the amount is to "*compensate* the Ad Hoc Committee of Corporate Creditors and its counsel." (Settlement Term Sheet § 7 (emphasis added).) However, whether this compensation covers more than just professional fees is unclear.

The Post-Effective Date Debtors argue that "[c]ompensation to the Ad Hoc Committee of Corporate Creditors and its professionals is not subject to the requirements of . . . section 503(b) of the Bankruptcy Code." (Motion ¶ 60.) They also point to the language in the Plan they believe supports a finding that Court approval of the $1.5 million payment is unnecessary. (*Id.* ¶¶ 61–62.) Specifically, the Post-Effective Date Debtors characterize the payment to the Ad Hoc Committee of Corporate Creditors as merely "a settling of claims," and note that the Plan provides that any claims may be "adjusted or expunged on the Claims Register at the direction of the Debtors, the Post-Effective Date Debtors, or the applicable Litigation Administrator(s)" without, among other things, approval of the Court. (*Id.* ¶ 61 (quoting Plan, Art. VII.D).) Moreover, pursuant to Article II.B.4 of the Plan, the Post-Effective Date Debtors' payment of professional fees also does not need Court approval. (*See id.* ¶ 62.)

However, the "settling of claims" here, subject to certain exceptions, is with respect to *all* Eligible Corporate Creditors. (*See* Sept. 15, 2024 Hr'g Tr. at 22:8–15 ("[A]ny eligible corporate creditor has the option [to participate in the Settlement]. They do not have to file a joinder.

They did not have to appear in the mediation. . . . [E]verybody will get a form."); *id.* at 31:5–8,

17–19 ("I mean, it's clear it's available to all corporate creditors who wish to join the settlement,

whether they were part of the ad hoc group or not. . . . [T]his is not a settlement that is limited to

just those corporate creditors who participated in the mediation.").)   Yet, the $1.5 million

payment contemplated under the Settlement only benefits the nine members of the Ad Hoc

Committee of Corporate Creditors and their counsel.  Any payments of amounts above

professional fees actually incurred then is, in effect, a naked bonus payment to the Ad Hoc

Committee of Corporate Creditors for its "contribution" and as "partial consideration" for the

releases contemplated in the Settlement.  (*See* Settlement Term Sheet § 7.)  This cannot be

allowed.

As it is unclear whether the $1.5 million "cherry on top" bonus—available solely to the

Ad Hoc Committee of Corporate Creditors and its counsel—is comprised solely of professional

fees, it is not approved.  Rather, counsel to the Ad Hoc Committee of Corporate Creditors may

file an application for payment of fees that must include detailed and itemized time records

reflecting the work performed from the time of its engagement through the execution of the

Settlement Term Sheet.  Only those amounts, as the Post-Effective Date Debtors recognize, may

be paid in accordance with Article II.B.4 of the Plan.

## IV.   CONCLUSION

For the reasons discussed, the Court **GRANTS** the Motion, in part, **APPROVES** the

Settlement, including the relevant Parties' entry into the Supplemental Coinbase Agreement, but

**DENIES** the contemplated $1.5 million payment to the Ad Hoc Committee of Corporate

Creditors and its counsel.  Any application by counsel to the Ad Hoc Committee of Corporate

Creditors seeking authorization for the payment of professional fees incurred for the period

specified must be filed within 14 days from entry of this Opinion.

Counsel for the settling parties shall submit a new proposed order consistent with this

Opinion.

Dated:     October 3, 2024
           New York, New York

_Martin Glenn_
_____
MARTIN GLENN
Chief United States Bankruptcy Judge